UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**UNITED STATES OF AMERICA**

v.   Case No: 6:17-cr-3-Orl-41GJK

**JUAN ALMEIDA**,
**ANDREW CASSARA** and
**WADE JONES, JR.**
_____/

**ORDER**

THIS CAUSE is before the Court on the Motion to Suppress (Doc. 141) and the supplement thereto (Doc. 160), which were filed by Defendant Andrew Cassara, and which Defendant Juan Almeida has adopted in part, (Doc. Nos. 157, 165, 179). The Government filed a Response (Doc. 163), and an evidentiary hearing was held on October 27, 2017, (Min. Entry, Doc. 168).

**I.   BACKGROUND**

Defendants in this case have been charged with conspiracy to distribute a controlled substance—marijuana—and Defendants Almeida and Cassara have been charged with knowingly possessing a firearm in furtherance of a drug trafficking crime. (Indictment, Doc. 1, at 1–2). During its investigation, the Government executed six search warrants—five property search warrants and one vehicle tracking warrant. Defendants have now moved to suppress the fruits of five of those searches, arguing that there was not probable cause on the face of the affidavits in support of the warrants and that the warrants contain numerous material omissions and misleading facts. The warrants were issued in succession, and each affidavit in support of the warrants built upon information disclosed in the previous affidavits. The specific facts of each search warrant will be discussed below.

## II. LEGAL FRAMEWORK

To obtain a search warrant, law enforcement must "convince the authorizing magistrate that probable cause exists for the search." *United States v. Pendleton*, 447 F. App'x 978, 981 (11th Cir. 2011). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "[A] magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (quotation omitted).

Further, "[a]ffidavits supporting warrants are presumptively valid." *United States v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978). "A defendant may challenge the validity of the government's affidavit by making a substantial preliminary showing that a false statement was included in the warrant affidavit knowingly and intentionally or with reckless disregard for the truth." *United States v. Gamory*, 635 F.3d 480, 490 (11th Cir. 2011). "In order to be entitled to relief a defendant must show not only that misrepresentations or omissions were intentionally or recklessly made, but also that, absent those misrepresentations or omissions, probable cause would have been lacking." *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).

## III. ANALYSIS

### A. Location 1

#### 1. Facts

The first warrant was issued on February 10, 2015, and it authorized the search of a specified storage unit located at Vista Self Storage in Orlando, Florida ("Location 1"). The affidavit in support of the Location 1 search warrant ("Affidavit 1," Joint Ex. 1) was authored by Special Agent Joshua Baker, and it describes the activities related to a suspected drug trafficking organization ("DTO") in Orlando, Florida, operated by individuals that were from the Dominican Republic. (*See generally id.*). The Drug Enforcement Administration ("DEA") suspected that Defendants Cassara and Almeida were working with another individual, Nelson Pablo Yester-Garrido, who was located in South Africa, to facilitate the DTO. (*See id.* ¶¶ 1, 10). DEA agents employed a confidential source ("CS") and two undercover agents—Leo Conde and Junny Valerio—to gain information regarding the suspected DTO and Defendants. (*See id.* ¶¶ 10, 14).

Agent Baker received information from a DEA Agent in Los Angeles, California, that the CS had information about the DTO and that the CS had been instructed by Yester-Garrido to travel to Orlando. (*Id.* ¶ 10). On February 2, 2015, the CS met with Agent Baker and another special agent and informed them that he was to meet with two individuals regarding a drug debt owed to Yester-Garrido. (*Id.* ¶ 11). The CS told the agents that his instructions from Yester-Garrido were to re-establish a relationship with "the Dominican DTO" because it owed Yester-Garrido approximately $250,000 for drugs that had been delivered to the DTO but had not been paid for. (*Id.* ¶¶ 13, 15). According to the CS, over the previous five years—until the issue of the debt arose—the Dominican DTO had purchased approximately 200 pounds of marijuana per week from Yester-Garrido, paying him approximately $800,000 per month. (*Id.*).

On the same day, the CS and the Undercover Agents met with two individuals as directed by Yester-Garrido—Defendant Cassara and an unidentified individual referred to as "UCC-1." (*Id.* ¶ 14). During this meeting, Cassara and UCC-1 discussed the drug debt and re-establishing the

relationship with the Dominican DTO. (*Id.*). From there, all of the individuals at the meeting drove to Sanford, Florida, to meet with a representative of the DTO. (*Id.* ¶¶ 15–16). There, they met with a Dominican individual named Jose Quijada Garcia. (*Id.* ¶ 16). The CS told Quijada Garcia that they were there as representatives of Yester-Garrido to negotiate a mutually beneficial agreement and continue the relationship between the DTO and Yester-Garrido. (*Id.*). No agreement was made at that time, but Quijada Garcia and the CS agreed to continue negotiations. (*Id.*).

Two days later, on February 4, 2015, the CS and Undercover Agent Valerio met with Defendants Cassara and Almeida. (*Id.* ¶ 17). Almeida wanted to arrange another meeting with Quijada Garcia, and Almeida suggested possible terms of the debt repayment, which generally involved charging the DTO a higher price per pound of marijuana and using the additional money to pay off the debt. (*Id.*). Two days after that meeting, on February 6, 2015, the CS and Undercover Agent Valerio again met with Cassara and Almeida. (*Id.* ¶ 19). Cassara relayed the details of a plan to sell the DTO twenty-five pounds of marijuana for the higher price. (*Id.*). Specifically, Cassara stated that on February 9, 2015, the CS would meet Cassara with a white Dodge truck, Cassara would then load twenty-five pounds of marijuana into the truck and leave it in a then-undetermined location where a representative from the DTO would pick it up and leave the money. (*Id.*).

On February 9, 2015, the CS and Undercover Agent Conde were instructed by Yester-Garrido to meet with Quijada Garcia to finalize the sale. (*Id.* ¶ 21). They did so, and Quijada Garcia agreed with a few modifications. (*Id.*). The transaction would occur on February 10, 2015, and the marijuana would be given on consignment with payment being received later that same day. (*Id.*). After the meeting with Quijada Garcia, the CS and Undercover Agent Conde met with Cassara. (*Id.* ¶ 22). Cassara stated that he would package the marijuana in a suit case, place it in the back of

the white Dodge pickup truck, and leave the truck in the area of Semoran Boulevard in Orlando, Florida. (*Id.*). The plan was for the DTO representatives to retrieve the truck and return it later with the money. (*Id.*).

Immediately upon leaving this meeting, Cassara drove to the Location 1 storage unit. (*Id.* ¶ 23). Special Agent Baker and other law enforcement officers followed Cassara. (*Id.*). After Cassara passed through the gate to the storage unit property, Agent Baker went into the office and spoke with the property manager. (*Id.*). The property manager informed Agent Baker that Cassara had rented the Location 1 unit, paying $600 cash for a one-month lease. (*Id.*). In the office, Agent Baker was also able to see the closed-circuit television ("CCTV") security monitors. (*Id.*). On the monitors, Agent Baker observed Cassara drive his black Dodge pickup truck to Location 1; unload three duffle bags from the truck and placing them inside the unit; and then remove six large pieces of luggage from the unit and place them in the bed of the truck. (*Id.*).

Based on these facts, the Magistrate Judge issued a warrant to search Location 1. As noted, Defendants assert that there was not probable cause on the face of the affidavit and that the Government in bad faith or with reckless disregard for the truth made material misrepresentations and omissions in the affidavit.

### B. Probable Cause

Defendants assert that Affidavit 1 does not establish probable cause because it is based on Agent Baker's beliefs rather than facts. Defendants argue that if the Court were to remove all of Agent Baker's beliefs from Affidavit 1, it would be left with only vague, conclusory allegations insufficient to support a finding of probable cause. To the contrary, the facts set forth above are taken from Affidavit 1 and do not include any unsupported beliefs. The facts clearly establish probable cause to believe that Defendants Cassara and Almeida were involved in some sort of drug

trafficking operation and that there was a fair probability that evidence of criminal activity would be found at Location 1.

Notably, Affidavit 1 indicates that Cassara and Almeida were operating at the direction of Yester-Garrido; it also indicates that Yester-Garrido had maintained a relationship with the Dominican DTO in Orlando for five years, distributing approximately 200 pounds of marijuana each week. Thus, there was probable cause to believe that a large-scale trafficking organization existed in Orlando and that Cassara and Almeida were involved with the DTO. Moreover, the facts asserted in Affidavit 1 establish that Cassara was directly involved in packaging and delivering the marijuana to the DTO and, more specifically, that he was in charge of facilitating the February 10, 2015 delivery of twenty-five pounds of marijuana.

Finally, after explaining that he was going to package the twenty-five pounds of marijuana in a suitcase and make the delivery the following day, Cassara drove directly to Location 1, where he loaded several suitcases into his truck. These facts are sufficient to establish probable cause to believe that the suitcases contained marijuana and that the storage unit was being used to facilitate the DTO's operations and, thus, that there was a fair probability that the storage unit contained evidence of Cassara's criminal activity. Defendants' argument that the agents did not know for certain that there was marijuana in the suitcases is unavailing. Based on the previously explained facts, there was probable cause to believe that Cassara was at the storage unit to obtain the twenty-five pounds of marijuana; the agents did not need absolute proof that there was marijuana in the storage unit and the suitcases.

### C. Bad Faith or Recklessness

Next Defendants argue that even if on the face of Affidavit 1 there was probable cause, there were material misstatements and omissions, which were either knowingly or recklessly

made, and which undermine probable cause. "To prevail on a motion to suppress based on allegations of falsity in the supporting affidavit, the defendant bears the burden of establishing that: (1) the affiant made the alleged misrepresentations or omissions knowingly or recklessly, and (2) the alleged omissions or exclusion of the alleged misrepresentations would result in lack of probable cause." *United States v. Holt*, 408 F. App'x 229, 234 (11th Cir. 2010)

To begin with, at the hearing, Agent Baker testified that some of the conversations between the co-conspirators and undercover agents were conducted in Spanish and then translated by a fellow agent who was fluent in Spanish. In addition, there was testimony that the statements made in Affidavit 1 pertaining to those conversations were summaries of what was said, rather than direct quotes. These summaries resulted from the agents using their training and experience to interpret the slang that was used during these conversations. For example, during the conversations, the word "marijuana," which appears frequently in the Affidavit, was not expressly used. While Defendants decry the use of such translations and interpretations, they fail to point out a single instance where a translation or interpretation was false. Further, Agent Baker testified that steps were taken to ensure that the translations were accurate.

Defendants next take issue with specific language within Affidavit 1. First, Defendants point to the statements in paragraph eight that "Cassara is a member of a large-scale, Orlando, Florida based marijuana distribution organization" and that "Cassara distributes marijuana in Central Florida and other areas that is transported there from an unknown source." (Joint Ex. 1 ¶ 8). Defendants assert that these statements are exaggerations of what was actually known at the time Affidavit 1 was authored. Defendants also assert that Agent Baker made misleading statements in paragraph ten about Yester-Garrido, namely that Agent Baker misrepresented information regarding Yester-Garrido's previous drug trafficking charges in the Southern District

of Florida and that Yester-Garrido had fled and was hiding in South Africa, when in fact, Yester-Garrido had provided federal authorities with his address in South Africa.[1]

Even if Defendants established that these statements and omissions were false and misleading, they have failed to establish that they were material. In other words, when the alleged misstatements are stricken and the purported omissions are considered, there was still probable cause to support the issuance of the search warrant for Location 1. While the allegations of Cassara's larger involvement in the DTO, if true, would certainly support a probable cause determination, they are unnecessary; there are ample, specific facts that implicate Cassara's involvement in the particular drug transaction at issue, which are sufficient to establish probable cause. Similarly, the allegations regarding Yester-Garrido have very little impact on the overall probable cause analysis. Even without Yester-Garrido, the other statements in Affidavit 1 establish that Cassara knew about a group of people who had previously sold a large amount of marijuana, that Cassara was working to re-establish a relationship with those individuals in order to continue selling large amounts of marijuana, and that he had agreed to provide those individuals with twenty-five pounds of marijuana the next day. Cassara then took steps that were consistent with retrieving twenty-five pounds of marijuana from Location 1. Thus, there was probable cause to support the issuance of a search warrant for Location 1 even when the alleged misstatements are disregarded and the omissions considered.

---

[1] Additionally, in the Motion to Suppress, Defendants assert that Agent Baker made inaccurate statements about what he observed on the CCTV monitors. Defendants' argument is premised on the fact that the only video from the CCTV system that had been turned over did not contain the images described in Affidavit 1. However, at the hearing, Agent Baker testified that when the Government requested the video from the night of February 9, 2015, the storage facility did not have it. Agent Baker confirmed that he personally observed all of the activities on the CCTV monitors that are attested to in Affidavit 1. Thus, there is no evidence of any misstatements regarding what was observed on the CCTV monitors.

**D. Location 4**

*1. Facts*

Five days after the Location 1 search warrant was issued, the Location 4 search warrant was issued, which authorized law enforcement to search a different storage unit located at a Discount Self Storage facility in Ovideo, Florida ("Location 4"). (*See generally* Location 4 Search Warrant, Joint Ex. 4). In the interim, law enforcement conducted two additional searches.

The Affidavit in Support of the Location 4 Search ("Affidavit 4," Joint Ex. 4) re-states the facts asserted in Affidavit 1, but it also adds some details that were not included in Affidavit 1 and includes information about events that occurred after the Location 1 search. After the February 6, 2015 meeting, Cassara drove a white Ford truck to a restaurant parking lot, parked, got into a black Dodge truck, and left. (*Id.* ¶¶ 19, 21). After Cassara left in the black Dodge, Agent Baker checked the vehicle identification number on the white Ford truck; it had been temporarily registered to Almeida, but the registration was no longer valid. (*Id.* ¶ 21). Cassara then drove the black Dodge truck to a residence on Silver Birch Way ("Location 3"). (*Id.* ¶ 22). He remained inside Location 3 for approximately ten minutes. (*Id.*). Upon leaving Location 3, Cassara was driving erratically throughout the neighborhood and circling blocks. (*Id.*). Eventually, he went to the Mall at Millennia for several hours and then drove back to Location 3. (*Id.* ¶¶ 22–23). But upon arriving in the area of Location 3, Cassara drove to a different entrance of the development, did a U-turn, and parked near the entrance to the development where he could observe traffic entering the development. (*Id.* ¶ 23). After sitting there for a few minutes, Cassara drove to the other entrance of the development and then went to Location 3. (*Id.*).

Three days after these events is when Cassara went to Location 1 and removed the six suitcases, leading to the issuance of the Location 1 search warrant. Upon leaving Location 1 with

the six suitcases, Cassara delivered the white Dodge pickup truck to the CS. (*Id.* ¶ 29). Cassara then proceeded in his black Dodge truck to a residence on Lakeshore Drive in Clermont, Florida ("Location 2"). (*Id.*). Shortly thereafter, law enforcement executed the search warrant at Location 1; approximately 533 pounds of marijuana was seized from Location 1. (*Id.* ¶¶ 30–31). Additionally, while preparing to execute the Location 1 search warrant, agents observed a black Dodge pickup truck with the same Florida license plate as the one that had been driven by Cassara drive near the agents and then quickly leave the area. (*Id.* ¶ 32). That registration number did not match any valid registration in the Florida Department of Motor Vehicles database. (*Id.*). Shortly thereafter, the CS told Agent Baker that Cassara had contacted him to advise the CS that Cassara had observed police officers in the area of Location 1. (*Id.* ¶ 33). This prompted Cassara to tell the CS that he was fleeing soon and to advise the CS to flee as well. (*Id.*). Yester-Garrido also contacted the CS and advised him and Cassara to flee. (*Id.*).

On the same day, February 10, 2015, law enforcement executed a search warrant at Location 2—the Clermont residence—and seized ten pounds of marijuana with the same packaging as the marijuana seized from Location 1, a money counter, and several garbage bags containing a large amount of empty wrappings, which also had the same markings as the previously discovered packaging and which previously contained marijuana. (*Id.* ¶¶ 35–36). Two days later, law enforcement executed a search warrant at Location 3—the Silver Birch Way residence—and seized approximately 773 pounds of marijuana, three money counters, two large heat sealers, and numerous boxes of food saver bags used to process marijuana. (*Id.* ¶ 37).[2] The markings on the

---

[2] In a single paragraph, without any citation to legal authority, Cassara asserts that the items seized from Location 3 should be suppressed because the Government failed to provide Cassara with a complete list of what was seized. Cassara therefore maintains that he does not know whether any of his personal items were seized, and thus, he cannot properly determine whether he has standing to challenge the search. (Doc. 141 at 16). This argument is without merit. Standing to

packages of marijuana were, again, the same as the markings on the packages of marijuana seized at Location 1 and Location 2. (*Id.*).

On February 13, 2015, Sergeant Keith Vidler, Orange County Sheriff's Office, went to a Discount Self Storage facility in Winter Garden, Florida. (*Id.* ¶ 38). The manager there informed Sergeant Vidler that Cassara had rented the Location 4 unit at the Aloma Avenue facility and that Cassara had accessed the Location 4 on February 10, 2015, at 1:51 a.m.—approximately one hour after Cassara observed law enforcement at the Location 1 storage facility. (*Id.*). The next day, Sergeant Vidler and a K-9 unit went to Location 4. (*Id.* ¶ 39). The K-9 alerted to the scent of narcotics in the area of Location 4. (*Id.*).

   2.   *Analysis*

Defendants first re-assert the arguments made with regard to the Location 1 search. Those arguments have already been rejected. As to the statements specific to Affidavit 4, Defendants assert that the Magistrate Judge was not permitted to rely on the Agent's beliefs. Affidavit 4 states that based on the fact that Defendants were switching vehicles and driving vehicles without proper registration, Agent Baker "believe[d] Almeida and Cassara were attempting to mask their association with the vehicles they were operating and using to meet with the CS." (*Id.* ¶ 21). Affidavit 4 goes on to say that Agent Baker believed Cassara's "driving maneuvers [were] counter surveillance," and that he "believe[d] that Cassara was using counter surveillance techniques in an

---

challenge a search is not based on whether someone's personal items were seized, it is based on whether an individual has a reasonable expectation of privacy in the property searched. *See United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) ("Fourth Amendment rights . . . are personal, and only individuals who actually enjoy the reasonable expectation of privacy have standing to challenge the validity of a government search.").

attempt to detect any law enforcement vehicles that may have been following him in order to keep law enforcement from observing him entering Location 3." (*Id.* ¶¶ 22–23).

Even assuming these statements should be stricken, however, there is more than sufficient information upon which the Magistrate Judge properly determined that probable cause existed. Certainly engaging in techniques to avoid detection by law enforcement is supportive of probable cause, but removing those statements here is akin to removing a few snowflakes from an avalanche: it has no impact. At the point where the Magistrate Judge was issuing the search warrant for Location 4, there was indeed an avalanche of evidence to support a probable cause determination. In addition to all of the information discussed in the Location 1 analysis, at the time the Location 4 search warrant was issued, the Magistrate Judge was presented with evidence that law enforcement had recovered over 1300 pounds of marijuana along with drug trafficking paraphernalia from additional locations that were associated with Cassara. Law enforcement had also presented the Magistrate Judge with ample evidence that Cassara was taking active steps to deliver twenty-five pounds of marijuana to a distributor in an effort to re-establish an ongoing trafficking relationship. And, to top it all off, a K-9 alerted to the presence of narcotics in Location 4. Quite simply, there was overwhelming evidence establishing probable cause to issue the Location 4 search warrant.

### E. Vehicle Tracking Warrant

#### 1. Facts

On February 15, 2015, ten days after the Location 4 search, a vehicle tracking warrant for a white Dodge pickup truck (the "Subject Vehicle") that had been used by Cassara was issued. (Tracking Warrant, Joint Ex. 5). The Affidavit in Support of the Tracking Warrant ("Tracking Affidavit," Joint Ex. 5) indicated that the Subject Vehicle was the vehicle that Cassara had stated

that he would use to facilitate the sale of the twenty-five pounds of marijuana to the DTO. (*Id.* ¶¶ 17, 23). After going to Location 1 in his black truck and loading suitcases into that truck, Cassara was later observed dropping off the Subject Vehicle to the CS. (*Id.* ¶ 26). It does not appear that the Subject Vehicle contained any marijuana when it was given to the CS. But after Cassara observed law enforcement executing the search of Location 1 and told the CS that he was planning to flee, Yester-Garrido contacted the CS and asked about the whereabouts of the Subject Vehicle. (*Id.* ¶ 35). Yester-Garrido then told the CS to return the Subject Vehicle to someone within the DTO. (*Id.*). The Magistrate Judge determined that there was probable cause to believe that once the Subject Vehicle was returned via the CS, it would be used to facilitate illegal activities.

        2.    *Analysis*

Defendants argue that there was not probable cause for a vehicle tracking warrant primarily because when Cassara dropped off the Subject Vehicle to the CS it did not contain any marijuana. This argument ignores the "practical, common-sense" analysis required for probable cause. *Gates*, 462 U.S. at 238. At the time of the issuance of the Tracking Warrant, there was an abundance of evidence that a large-scale marijuana trafficking organization was being operated in Orlando and that Cassara was involved with the organization. That paired with the fact that the Subject Vehicle had a temporary vehicle license plate, did not have a valid registration, was mentioned to be used in the sale of twenty-five pounds of marijuana, and was being requested to be returned to individuals who were involved in the distribution of marijuana is sufficient to establish probable cause that, going forward, the Subject Vehicle would be used in the commission of related crimes.

    **F.**    **Location 5**

        1.    *Facts*

Nearly two years later, on January 11, 2017, Cassara and Almeida were indicted in this case. (Doc. 1 at 5). On January 19, 2017, law enforcement officers arrested Almeida at a home in Boca Raton, Florida ("Location 5"). (Affidavit 5, Joint Ex. 6, ¶¶ 5, 39). The home was owned by Cassara. (*Id.*). While law enforcement was attempting to locate Almeida and Cassara at the residence and performing a security sweep, they observed a number of items in plain sight: at least five firearms in the master bedroom closet, one of which matched the description of a firearm that was in Cassara's possession during the 2015 meetings; a door of a safe in the poured concrete floor of the closet; several opened semi-clear food saver bags and wrappings used to bundle U.S. currency together in a cardboard box; a money counter box; a stack of U.S. currency approximately one inch tall, which appeared to be in twenty dollar bill denominations; and a California driver's license with Cassara's name and photograph. (*Id.* ¶¶ 39–41). One of the agents also noted the odor of marijuana in the laundry room of the residence. (*Id.* ¶ 40).

**G.     Analysis**

Defendants assert that there was not probable cause for the issuance of the Location 5 search warrant because the information in Affidavit 5 was stale. "For probable cause to exist . . . the information supporting of the government's application for a search warrant must be timely . . . . Warrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994), *holding modified on other grounds by United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998). Nevertheless, "[t]he length of time between the date on which all of the facts supporting probable cause were known and the date the warrant was issued is only one factor. Probable cause is not determined merely by counting the number of days between the facts relied upon and the

warrant's issuance." *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985), *holding modified on other grounds by United States v. Dennis*, 786 F.2d 1029 (11th Cir. 1986).

Here, the 2015 information is simply provided to give context. And even if all of the 2015 information is excluded, Affidavit 5 sufficiently establishes probable cause. Agents observed firearms and items known through their training and experience to be used in the distribution of drugs and money laundering, including a money counter, a large amount of cash, food saver bags, and currency wrappings. These items combined with the smell of marijuana in the house were sufficient to establish probable cause.

Defendants also attack probable cause on the basis of omissions. Specifically, Defendants argue that the Government omitted information regarding the CS's arrest for domestic violence and his untruthfulness to his probation officer. However, the probable cause for the Location 5 search stems from the personal observations of law enforcement officers at the location. The reliability of the CS is irrelevant to the Location 5 search. In addition, Defendants take issue with the fact that the Government failed to include that Almeida had previously been a confidential source in connection with Yester-Garrido's activities. First, Agent Baker had information that Almeida's status as a confidential informant had been terminated in 2014. Second, the search was conducted at Cassara's home, not Almeida's home. So, even if there may have been reason to believe that Almeida was working with law enforcement, that would not have impacted the import of the items found at Cassara's home—particularly given that Cassara had no history of cooperating with law enforcement.

### IV.  CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that the Motion to Suppress (Doc. 141) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on November 6, 2017.



Copies furnished to:

Counsel of Record